## COUNTY OF WASHINGTON, OREGON, ET AL. *v.* GUNTHER ET AL.

No. 80–429. Argued March 23, 1981—Decided June 8, 1981

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART and POWELL, JJ., joined, *post*, p. 181.

*Lawrence R. Derr* argued the cause and filed a brief for petitioners.

*Carol A. Hewitt* argued the cause and filed a brief for respondents.

*Barry Sullivan* argued the cause for the United States et al. as *amici curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Acting Assistant Attorney General Turner, Deputy Solicitor General Wallace, Walter W. Barnett, Neil H. Cogan,* and *Leroy D. Clark.**

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is whether § 703 (h) of Title VII of the Civil Rights Act of 1964, 78 Stat. 257, 42 U. S. C. § 2000e–2 (h), restricts Title VII's prohibition of sex-based wage discrimination to claims of equal pay for equal work.

I

This case arises over the payment by petitioner County of Washington, Ore., of substantially lower wages to female

---

*Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis, Jr., Isabelle Katz Pinzler, E. Richard Larson,* and *Joan E. Bertin* for the American Civil Liberties Union et al.; by *Richard B. Sobol, Michael B. Trister, Laurence Gold, J. Albert Woll, Winn Newman, Carole Wilson, John Fillion, Susan Silber,* and *Catherine Waelder* for the American Federation of Labor and Congress of Industrial Organizations et al.; and by *Norman Redlich, William L. Robinson, Norman J. Chachkin, Beatrice Rosenberg,* and *Richard T. Seymour* for the Lawyer's Committee for Civil Rights Under Law et al.

Briefs of *amici curiae* were filed by *Kenneth C. McGuiness, Robert E. Williams,* and *Douglas S. McDowell* for the Equal Employment Advisory Council et al.; and by *Lawrence Z. Lorber* and *Robin M. Schachter* for the American Society for Personnel Administration.

guards in the female section of the county jail than it paid to male guards in the male section of the jail.[1] Respondents are four women who were employed to guard female prisoners and to carry out certain other functions in the jail.[2] In January 1974, the county eliminated the female section of the jail, transferred the female prisoners to the jail of a nearby county, and discharged respondents. 20 FEP Cases 788, 790 (Ore. 1976).

Respondents filed suit against petitioners in Federal District Court under Title VII, 42 U. S. C. § 2000e *et seq.*, seeking backpay and other relief.[3] They alleged that they were paid unequal wages for work substantially equal to that performed by male guards, and in the alternative, that part of the pay differential was attributable to intentional sex discrimination.[4] The latter allegation was based on a claim

---

[1] Prior to February 1, 1973, the female guards were paid between $476 and $606 per month, while the male guards were paid between $668 and $853. Effective February 1, 1973, the female guards were paid between $525 and $668, while salaries for male guards ranged from $701 to $940. 20 FEP Cases 788, 789 (Ore. 1976).

[2] Oregon requires that female inmates be guarded solely by women, Ore. Rev. Stat. §§ 137.350, 137.360 (1979), and the District Court opinion indicates that women had not been employed to guard male prisoners. 20 FEP Cases, at 789, 792, nn. 8, 9. For purposes of this litigation, respondents concede that gender is a bona fide occupational qualification for some of the female guard positions. See 42 U. S. C. § 2000e–2 (e)(1); *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977).

[3] Respondents could not sue under the Equal Pay Act because the Equal Pay Act did not apply to municipal employees until passage of the Fair Labor Standards Amendments of 1974, 88 Stat. 55, 58–62. Title VII has applied to such employees since passage of the Equal Employment Opportunity Act of 1972, § 2 (1), 86 Stat. 103.

[4] Respondents also contended that they were discharged and not rehired in retaliation for their demands for equal pay. Respondent Vander Zanden also contended that she was denied medical leave in retaliation for such demands. The District Court rejected those contentions, and the Court of Appeals affirmed. Those claims are not before this Court.

that, because of intentional discrimination, the county set the pay scale for female guards, but not for male guards, at a level lower than that warranted by its own survey of outside markets and the worth of the jobs.

After trial, the District Court found that the male guards supervised more than 10 times as many prisoners per guard as did the female guards, and that the females devoted much of their time to less valuable clerical duties. It therefore held that respondents' jobs were not substantially equal to those of the male guards, and that respondents were thus not entitled to equal pay. 20 FEP Cases, at 791. The Court of Appeals affirmed on that issue, and respondents do not seek review of the ruling.

The District Court also dismissed respondents' claim that the discrepancy in pay between the male and female guards was attributable in part to intentional sex discrimination. It held as a matter of law that a sex-based wage discrimination claim cannot be brought under Title VII unless it would satisfy the equal work standard of the Equal Pay Act of 1963, 29 U. S. C. § 206 (d).[5] 20 FEP Cases, at 791. The court therefore permitted no additional evidence on this claim, and made no findings on whether petitioner county's pay scales for female guards resulted from intentional sex discrimination.

The Court of Appeals reversed, holding that persons alleging sex discrimination "are not precluded from suing under Title VII to protest . . . discriminatory compensation practices" merely because their jobs were not equal to higher paying jobs held by members of the opposite sex. 602 F. 2d 882, 891 (CA9 1979), supplemental opinion on denial of rehearing, 623 F. 2d 1303, 1313, 1317 (1980). The court remanded to the District Court with instructions to take evidence on respondents' claim that part of the difference between their rate of pay and that of the male guards is attributable to sex

---

[5] See *infra*, at 168.

discrimination. We granted certiorari, 449 U. S. 950 (1980), and now affirm.

We emphasize at the outset the narrowness of the question before us in this case. Respondents' claim is not based on the controversial concept of "comparable worth," [6] under which plaintiffs might claim increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same organization or community.[7] Rather, respondents seek to prove, by direct evidence, that their wages were depressed because of intentional sex discrimination, consisting of setting the wage scale for female guards, but not for male guards, at a level lower than its own survey of outside markets and the worth of the jobs warranted. The narrow question in this case is whether such a claim is precluded by the last sentence of § 703 (h) of Title VII, called the "Bennett Amendment." [8]

---

[6] The concept of "comparable worth" has been the subject of much scholarly debate, as to both its elements and its merits as a legal or economic principle. See, e. g., E. Livernash, Comparable Worth: Issues and Alternatives (1980); Blumrosen, Wage Discrimination, Job Segregation, and Title VII of the Civil Rights Act of 1964, 12 U. Mich. J. L. Ref. 397 (1979); Nelson, Opton, & Wilson, Wage Discrimination and the "Comparable Worth" Theory in Perspective, 13 U. Mich. J. L. Ref. 231 (1980). The Equal Employment Opportunity Commission has conducted hearings on the question, see BNA Daily Labor Report Nos. 83–85 (Apr. 28–30, 1980), and has commissioned a study of job evaluation systems, see D. Treiman, Job Evaluation: An Analytic Review (1979) (interim report).

[7] Respondents thus distinguish *Lemons* v. *City and County of Denver*, 620 F. 2d 228 (CA10), cert. denied, 449 U. S. 888 (1980), on the ground that the plaintiffs, nurses employed by a public hospital, sought increased compensation on the basis of a comparison with compensation paid to employees of comparable value—other than nurses—in the community, without direct proof of intentional discrimination.

[8] We are not called upon in this case to decide whether respondents have stated a prima facie case of sex discrimination under Title VII, cf. *Christensen* v. *Iowa*, 563 F. 2d 353 (CA8 1977), or to lay down standards for the further conduct of this litigation. The sole issue we decide is whether respondents' failure to satisfy the equal work standard of the Equal Pay Act in itself precludes their proceeding under Title VII.

## II

Title VII makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U. S. C. § 2000e–2 (a). The Bennett Amendment to Title VII, however, provides:

> "It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206 (d) of title 29." 42 U. S. C. § 2000e–2 (h).

To discover what practices are exempted from Title VII's prohibitions by the Bennett Amendment, we must turn to § 206 (d)—the Equal Pay Act—which provides in relevant part:

> "No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 77 Stat. 56, 29 U. S. C. § 206 (d)(1).

On its face, the Equal Pay Act contains three restrictions pertinent to this case. First, its coverage is limited to those

employers subject to the Fair Labor Standards Act. S. Rep. No. 176, 88th Cong., 1st Sess., 2 (1963). Thus, the Act does not apply, for example, to certain businesses engaged in retail sales, fishing, agriculture, and newspaper publishing. See 29 U. S. C. §§ 203 (s), 213 (a) (1976 ed. and Supp. III). Second, the Act is restricted to cases involving "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U. S. C. § 206 (d)(1). Third, the Act's four affirmative defenses exempt any wage differentials attributable to seniority, merit, quantity or quality of production, or "any other factor other than sex." *Ibid.*

Petitioners argue that the purpose of the Bennett Amendment was to restrict Title VII sex-based wage discrimination claims to those that could also be brought under the Equal Pay Act, and thus that claims not arising from "equal work" are precluded. Respondents, in contrast, argue that the Bennett Amendment was designed merely to incorporate the four affirmative defenses of the Equal Pay Act into Title VII for sex-based wage discrimination claims. Respondents thus contend that claims for sex-based wage discrimination can be brought under Title VII even though no member of the opposite sex holds an equal but higher paying job, provided that the challenged wage rate is not based on seniority, merit, quantity or quality of production, or "any other factor other than sex." The Court of Appeals found respondents' interpretation the "more persuasive." 623 F. 2d, at 1311. While recognizing that the language and legislative history of the provision are not unambiguous, we conclude that the Court of Appeals was correct.

## A

The language of the Bennett Amendment suggests an intention to incorporate only the affirmative defenses of the Equal Pay Act into Title VII. The Amendment bars sex-based wage discrimination claims under Title VII where the

pay differential is "authorized" by the Equal Pay Act. Although the word "authorize" sometimes means simply "to permit," it ordinarily denotes affirmative enabling action. Black's Law Dictionary 122 (5th ed. 1979) defines "authorize" as "[t]o empower; to give a right or authority to act." [9] Cf. 18 U. S. C. § 1905 (prohibiting the release by federal employees of certain information "to any extent not authorized by law"); 28 U. S. C. § 1343 (1976 ed., Supp. III) (granting district courts jurisdiction over "any civil action authorized by law"). The question, then, is what wage practices have been affirmatively authorized by the Equal Pay Act.

The Equal Pay Act is divided into two parts: a definition of the violation, followed by four affirmative defenses. The first part can hardly be said to "authorize" anything at all: it is purely prohibitory. The second part, however, in essence "authorizes" employers to differentiate in pay on the basis of seniority, merit, quantity or quality of production, or any other factor other than sex, even though such differentiation might otherwise violate the Act. It is to these provisions, therefore, that the Bennett Amendment must refer.

Petitioners argue that this construction of the Bennett Amendment would render it superfluous. See *United States v. Menasche,* 348 U. S. 528, 538–539 (1955). Petitioners claim that the first three affirmative defenses are simply redundant of the provisions elsewhere in § 703 (h) of Title VII that already exempt bona fide seniority and merit systems and systems measuring earnings by quantity or quality of production,[10] and that the fourth defense—"any other

---

[9] Similarly, Webster's Third New International Dictionary 147 (1976) states that the word "authorize" "indicates endowing formally with a power or right to act, usu. with discretionary privileges." (Examples deleted.)

[10] Section 703 (h), as set forth in 42 U. S. C. § 2000e–2 (h), provides in relevant part:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different

factor other than sex"—is implicit in Title VII's general prohibition of sex-based discrimination.

We cannot agree. The Bennett Amendment was offered as a "technical amendment" designed to resolve any potential conflicts between Title VII and the Equal Pay Act. See *infra,* at 173. Thus, with respect to the first three defenses, the Bennett Amendment has the effect of guaranteeing that courts and administrative agencies adopt a consistent interpretation of like provisions in both statutes. Otherwise, they might develop inconsistent bodies of case law interpreting two sets of nearly identical language.

More importantly, incorporation of the fourth affirmative defense could have significant consequences for Title VII litigation. Title VII's prohibition of discriminatory employment practices was intended to be broadly inclusive, proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 431 (1971). The structure of Title VII litigation, including presumptions, burdens of proof, and defenses, has been designed to reflect this approach. The fourth affirmative defense of the Equal Pay Act, however, was designed differently, to confine the application of the Act to wage differentials attributable to sex discrimination. H. R. Rep. No. 309, 88th Cong., 1st Sess., 3 (1963). Equal Pay Act litigation, therefore, has been structured to permit employers to defend against charges of discrimination where their pay differentials are based on a bona fide use of "other factors other than sex." [11] Under the Equal

---

standards of compensation, or different terms, conditions, or privileges of employment *pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production* . . . provided that such differences are not the result of an intention to discriminate because of . . . sex . . . ." (Emphasis added.)

[11] The legislative history of the Equal Pay Act was examined by this Court in *Corning Glass Works* v. *Brennan,* 417 U. S. 188, 198–201 (1974). The Court observed that earlier versions of the Equal Pay bill were

Pay Act, the courts and administrative agencies are not permitted to "substitute their judgment for the judgment of the employer . . . who [has] established and applied a bona fide job rating system," so long as it does not discriminate on the basis of sex. 109 Cong. Rec. 9209 (1963) (statement of Rep. Goodell, principal exponent of the Act). Although we do not decide in this case how sex-based wage discrimination litigation under Title VII should be structured to accommodate the fourth affirmative defense of the Equal Pay Act, see n. 8, *supra,* we consider it clear that the Bennett Amendment, under this .interpretation, is not rendered ·superfluous.

We therefore conclude that only differentials attributable to the four affirmative defenses of the Equal Pay Act are "authorized" by that Act within the meaning of § 703 (h) of Title VII.

## B

The legislative background of the Bennett Amendment is fully consistent with this interpretation.

Title VII was the second bill relating to employment discrimination to be enacted by the 88th Congress. Earlier, the same Congress passed the Equal Pay Act "to remedy what was perceived to be a serious and endemic problem of [sex-based] employment discrimination in private industry," *Corning Glass Works* v. *Brennan,* 417 U. S. 188, 195 (1974). Any possible inconsistency between the Equal Pay

---

amended to define equal work and to add the fourth affirmative defense because of a concern that bona fide job-evaluation systems used by American businesses would otherwise be disrupted. *Id.,* at 199–201. This concern is evident in the remarks of many legislators. Representative Griffin, for example, explained that the fourth affirmative defense is a "broad principle," which "makes clear and explicitly states that a differential based on any factor or factors other than sex would not violate this legislation." 109 Cong. Rec. 9203 (1963). See also *id.,* at 9196 (remarks of Rep. Frelinghuysen); *id.,* at 9197–9198 (remarks of Rep. Griffin); *ibid.,* (remarks of Rep. Thompson); *id.,* at 9198 (remarks of Rep. Goodell); *id.,* at 9202 (remarks of Rep. Kelly); *id.,* at 9209 (remarks of Rep. Goodell); *id.,* at 9217 (remarks of Reps. Pucinski and Thompson).

Act and Title VII did not surface until late in the debate over Title VII in the House of Representatives, because, until then, Title VII extended only to discrimination based on race, color, religion, or national origin, see H. R. Rep. No. 914, 88th Cong., 1st Sess., 10 (1963), while the Equal Pay Act applied only to sex discrimination. Just two days before voting on Title VII, the House of Representatives amended the bill to proscribe sex discrimination, but did not discuss the implications of the overlapping jurisdiction of Title VII, as amended, and the Equal Pay Act. See 110 Cong. Rec. 2577–2584 (1964). The Senate took up consideration of the House version of the Civil Rights bill without reference to any committee. Thus, neither House of Congress had the opportunity to undertake formal analysis of the relation between the two statutes.[12]

---

[12] To answer certain objections raised by Senators concerning the House version of the Civil Rights bill, Senator Clark, principal Senate spokesman for Title VII, drafted a memorandum, printed in the Congressional Record. One such objection and answer concerned the relation between Title VII and the Equal Pay Act:

"Objection: The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.

"Answer: The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike title VII. Furthermore, under title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bona fide occupational qualification. The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under title VII." 110 Cong. Rec. 7217 (1964).

This memorandum constitutes the only formal discussion of the relation between the statutes prior to consideration of the Bennett Amendment. It need not concern us here, because it relates to Title VII before it was

Several Senators expressed concern that insufficient attention had been paid to possible inconsistencies between the statutes. See *id.*, at 7217 (statement of Sen. Clark); *id.*, at 13647 (statement of Sen. Bennett). In an attempt to rectify the problem, Senator Bennett proposed his amendment. *Id.*, at 13310. The Senate leadership approved the proposal as a "technical amendment" to the Civil Rights bill, and it was taken up on the floor on June 12, 1964, after cloture had been invoked. The Amendment engendered no controversy, and passed without recorded vote. The entire discussion comprised a few short statements:

> "Mr. BENNETT. Mr. President, after many years of yearning by members of the fair sex in this country, and after very careful study by the appropriate committees of Congress, last year Congress passed the so-called Equal Pay Act, which became effective only yesterday.
>
> "By this time, programs have been established for the effective administration of this act. Now, when the civil rights bill is under consideration, in which the word 'sex' has been inserted in many places, I do not believe sufficient attention may have been paid to possible conflicts between the wholesale insertion of the word 'sex' in the bill and in the Equal Pay Act.
>
> "The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified.
>
> "I understand that the leadership in charge of the bill have agreed to the amendment as a proper technical correction of the bill. If they will confirm that understand [*sic*], I shall ask that the amendment be voted on without asking for the yeas and nays.

amended by the Bennett Amendment. The memorandum obviously has no bearing on the meaning of the terms of the Bennett Amendment itself.

"Mr. HUMPHREY. The amendment of the Senator from Utah is helpful. I believe it is needed. I thank him for his thoughtfulness. The amendment is fully acceptable.

"Mr. DIRKSEN. Mr. President, I yield myself 1 minute.

"We were aware of the conflict that might develop, because the Equal Pay Act was an amendment to the Fair Labor Standards Act. The Fair Labor Standards Act carries out certain exceptions.

"All that the pending amendment does is recognize those exceptions, that are carried in the basic act.

"Therefore, this amendment is necessary, in the interest of clarification." *Id.,* at 13647.

As this discussion shows, Senator Bennett proposed the Amendment because of a general concern that insufficient attention had been paid to the relation between the Equal Pay Act and Title VII, rather than because of a *specific* potential conflict between the statutes.[13] His explanation that the Amendment assured that the provisions of the Equal Pay Act "shall not be nullified" in the event of conflict with Title VII may be read as referring to the affirmative defenses of the Act. Indeed, his emphasis on the "technical" nature of the Amendment and his concern for not disrupting the "ef-

---

[13] The dissent finds it "obvious" that the "principal way" the Equal Pay Act might have been "nullified" by enactment of Title VII is that the "equal pay for equal work standard" would not apply under Title VII. *Post,* at 193. There is, however, no support for this conclusion in the legislative history: not one Senator or Congressman discussing the Bennett Amendment during the debates over Title VII so much as mentioned the "equal pay for equal work" standard. Rather, Senator Bennett's expressed concern was for preserving the "programs" that had "been established for the effective administration" of the Equal Pay Act. 110 Cong. Rec. 13647 (1964). This suggests that the focus of congressional concern was on administrative interpretation and enforcement procedures, rather than on the "equal work" limitation.

fective administration" of the Equal Pay Act are more compatible with an interpretation of the Amendment as incorporating the Act's affirmative defenses, as administratively interpreted, than as engrafting all the restrictive features of the Equal Pay Act onto Title VII.[14]

Senator Dirksen's comment that all that the Bennett Amendment does is to "recognize" the exceptions carried in the Fair Labor Standards Act, suggests that the Bennett Amendment was necessary because of the exceptions to coverage in the Fair Labor Standards Act, which made the Equal Pay Act applicable to a narrower class of employers than was Title VII. See *supra,* at 167–168. The Bennett Amendment clarified that the standards of the Equal Pay Act would govern even those wage discrimination cases where only Title VII would otherwise apply. So understood, Senator Dirksen's remarks are not inconsistent with our interpretation.[15]

---

[14] The argument in the dissent that under our interpretation, the Equal Pay Act would be impliedly repealed and rendered a nullity, *post,* at 193, is mistaken. Not only might the substantive provisions of the Equal Pay Act's affirmative defenses affect the outcome of some Title VII sex-based wage discrimination cases, see *supra,* at 170–171, but the procedural characteristics of the Equal Pay Act also remain significant. For example, the statute of limitations for backpay relief is more generous under the Equal Pay Act than under Title VII, and the Equal Pay Act, unlike Title VII, has no requirement of filing administrative complaints and awaiting administrative conciliation efforts. Given these advantages, many plaintiffs will prefer to sue under the Equal Pay Act rather than Title VII. See B. Babcock, A. Freedman, E. Norton, & S. Ross, Sex Discrimination and the Law 507 (1975).

[15] In an exchange during the debate on Title VII, Senator Randolph asked Senator Humphrey whether certain differences in treatment in industrial retirement plans, including earlier retirement options for women, would be permissible. Senator Humphrey responded: "Yes. That point was made unmistakably clear earlier today by the adoption of the Bennett amendment; so there can be no doubt about it." 110 Cong. Rec. 13663–13664 (1964). Apparently, Senator Humphrey believed that the discriminatory provisions to which Senator Randolph referred were authorized by the Equal Pay Act. His answer does not reveal whether he

Although there was no debate on the Bennett Amendment in the House of Representatives when the Senate version of the Act returned for final approval, Representative Celler explained each of the Senate's amendments immediately prior to the vote. He stated that the Bennett Amendment "[p]rovides that compliance with the Fair Labor Standards Act as amended satisfies the requirement of the title barring discrimination because of sex . . . ." 110 Cong. Rec. 15896 (1964). If taken literally, this explanation would restrict Title VII's coverage of sex discrimination more severely than even petitioners suggest: not only would it confine *wage discrimination* claims to those actionable under the Equal Pay Act, but it would block *all other* sex discrimination claims as well." We can only conclude that Representative Celler's explanation was not intended to be precise, and does not provide a solution to the present problem.[16]

Thus, although the few references by Members of Congress to the Bennett Amendment do not explicitly confirm that its purpose was to incorporate into Title VII the four affirmative defenses of the Equal Pay Act in sex-based wage discrimination cases, they are broadly consistent with such a reading, and do not support an alternative reading.

---

believed such plans to fall within one of the affirmative defenses of the Act, or whether they simply did not violate the Act.

[16] The parties also direct our attention to several comments by Members and Committees of Congress made after passage of Title VII. See 111 Cong. Rec. 13359 (1965) (statement by Senator Bennett that "compensation on account of sex does not violate title VII unless it also violates the Equal Pay Act"); *id.*, at 18263 (statement by Senator Clark criticizing Senator Bennett's attempt to create *post hoc* legislative history and adding his own interpretation); S. Rep. No. 95–331, p. 7 (1977) (stating that the Bennett Amendment authorizes only those practices within the four affirmative defenses of the Equal Pay Act).

We are normally hesitant to attach much weight to comments made after the passage of legislation. See *Teamsters* v. *United States*, 431 U. S. 324, 354, n. 39 (1977). In view of the contradictory nature of these cited statements, we give them no weight at all.

## C

The interpretations of the Bennett Amendment, by the agency entrusted with administration of Title VII—the Equal Employment Opportunity Commission—do not provide much guidance in this case. Cf. *Griggs* v. *Duke Power Co.*, 401 U. S., at 433–434. The Commission's 1965 Guidelines on Discrimination Because of Sex stated that "the standards of 'equal pay for equal work' set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII." 29 CFR § 1604.7 (a) (1966). In 1972, the EEOC deleted this portion of the Guideline, see 37 Fed. Reg. 6837 (1972). Although the original Guideline may be read to support petitioners' argument that no claim of sex discrimination in compensation may be brought under Title VII except where the Equal Pay Act's "equal work" standard is met, EEOC practice under this Guideline was considerably less than steadfast.

The restrictive interpretation suggested by the 1965 Guideline was followed in several opinion letters in the following years.[17] During the same period, however, EEOC decisions frequently adopted the opposite position. For example, a reasonable-cause determination issued by the Commission in 1968 stated that "the existence of separate and different wage rate schedules for male employees on the one hand, and female employees on the other doing reasonably comparable work, establishes discriminatory wage rates based solely on the sex of the workers." *Harrington* v. *Picadilly Cafeteria*, Case No. AU 7–3–173 (Apr. 25, 1968).[18]

---

[17] See General Counsel's opinion of December 29, 1965, App. to Brief for Petitioners 7a; General Counsel's opinion of May 4, 1966, *id.*, at 11a–13a; Commissioner's opinion of July 23, 1966, *id.*, at 16a, BNA Daily Labor Report No. 171, pp. A–3 to A–4 (Sept. 1, 1966); Acting General Counsel's Memorandum of June 6, 1967, App. to Brief for Petitioners 21a–22a.

[18] See also Dec. No. 6–6–5762, CCH EEOC Decisions (1973) ¶ 6001,

The current Guideline does not purport to explain whether the equal work standard of the Equal Pay Act has any application to Title VII, see 29 CFR § 1604.8 (1980), but the EEOC now supports respondents' position in its capacity as *amicus curiae*. In light of this history, we feel no hesitation in adopting what seems to us the most persuasive interpretation of the Amendment, in lieu of that once espoused, but not consistently followed, by the Commission.

### D

Our interpretation of the Bennett Amendment draws additional support from the remedial purposes of Title VII and the Equal Pay Act. Section 703 (a) of Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of such individual's sex. 42 U. S. C. § 2000e-2 (a) (emphasis added). As Congress itself has indicated, a "broad approach" to the definition of equal employment opportunity is essential to overcoming and undoing the effect of discrimination. S. Rep. No. 867, 88th Cong., 2d Sess., 12 (1964). We must therefore avoid interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate.

Under petitioners' reading of the Bennett Amendment, only those sex-based wage discrimination claims that satisfy the "equal work" standard of the Equal Pay Act could be brought under Title VII. In practical terms, this means that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay. Thus, if

---

pp. 4008–4009, n. 22 (1968); Dec. No. 71–2629, CCH EEOC Decisions (1973) ¶ 6300, pp. 4538–4539 (1971).

an employer hired a woman for a unique position in the company and then admitted that her salary would have been higher had she been male, the woman would be unable to obtain legal redress under petitioners' interpretation. Similarly, if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men would be denied the right to prove that the system is a pretext for discrimination. Moreover, to cite an example arising from a recent case, *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S. 702 (1978), if the employer required its female workers to pay more into its pension program than male workers were required to pay, the only women who could bring a Title VII action under petitioners' interpretation would be those who could establish that a man performed equal work: a female auditor thus might have a cause of action while a female secretary might not. Congress surely did not intend the Bennett Amendment to insulate such blatantly discriminatory practices from judicial redress under Title VII.[19]

Moreover, petitioners' interpretation would have other far-reaching consequences. Since it rests on the proposition that any wage differentials not prohibited by the Equal Pay Act are "authorized" by it, petitioners' interpretation would lead to the conclusion that discriminatory compensation by employers not covered by the Fair Labor Standards Act is "authorized"—since not prohibited—by the Equal Pay Act. Thus it would deny Title VII protection against sex-based wage discrimination by those employers not subject to the Fair Labor Standards Act but covered by Title VII. See *supra,* at 167–168. There is no persuasive evidence that Con-

---

[19] The dissent attempts to minimize the significance of the Title VII remedy in these cases on the ground that the Equal Pay Act already provides an action for sex-based wage discrimination by women who hold jobs not *currently* held by men. *Post,* at 201–202. But the dissent's position would still leave remediless all victims of discrimination who hold jobs *never* held by men.

gress intended such a result, and the EEOC has rejected it since at least 1965. See 29 CFR § 1604.7 (1966). Indeed, petitioners themselves apparently acknowledge that Congress intended Title VII's broader coverage to apply to equal pay claims under Title VII, thus impliedly admitting the fallacy in their own argument. Brief for Petitioners 48.

Petitioners' reading is thus flatly inconsistent with our past interpretations of Title VII as "prohibit[ing] all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, sex, or national origin." *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 763 (1976). As we said in *Los Angeles Dept. of Water & Power* v. *Manhart, supra,* at 707, n. 13: "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the *entire spectrum* of disparate treatment of men and women resulting from sex stereotypes." (Emphasis added.) We must therefore reject petitioners' interpretation of the Bennett Amendment.

### III

Petitioners argue strenuously that the approach of the Court of Appeals places "the pay structure of virtually every employer and the entire economy . . . at risk and subject to scrutiny by the federal courts." Brief for Petitioners 99–100. They raise the specter that "Title VII plaintiffs could draw any type of comparison imaginable concerning job duties and pay between any job predominantly performed by women and any job predominantly performed by men." *Id.,* at 101. But whatever the merit of petitioners' arguments in other contexts, they are inapplicable here, for claims based on the type of job comparisons petitioners describe are manifestly different from respondents' claim. Respondents contend that the County of Washington evaluated the worth of their jobs; that the county determined that they should be paid approximately 95% as much as the male correctional officers; that it paid them only about 70% as much, while paying the male

officers the full evaluated worth of their jobs; and that the failure of the county to pay respondents the full evaluated worth of their jobs can be proved to be attributable to intentional sex discrimination. Thus, respondents' suit does not require a court to make its own subjective assessment of the value of the male and female guard jobs, or to attempt by statistical technique or other method to quantify the effect of sex discrimination on the wage rates.[20]

We do not decide in this case the precise contours of lawsuits challenging sex discrimination in compensation under Title VII. It is sufficient to note that respondents' claims of discriminatory undercompensation are not barred by § 703 (h) of Title VII merely because respondents do not perform work equal to that of male jail guards. The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE STEWART, and JUSTICE POWELL join, dissenting.

The Court today holds a plaintiff may state a claim of sex-based wage discrimination under Title VII without even establishing that she has performed "equal or substantially equal work" to that of males as defined in the Equal Pay Act. Because I believe that the legislative history of both the Equal Pay Act of 1963 and Title VII clearly establish that there can be no Title VII claim of sex-based wage discrimination without proof of "equal work," I dissent.

I

Because the Court never comes to grips with petitioners' argument, it is necessary to restate it here. Petitioners argue

---

[20] See Treiman, *supra* n. 6, at 35–36 (interim report to the EEOC); Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702, 721–725 (1980); Nelson, Opton, & Wilson, *supra* n. 6, at 278–288; Schwab, Job Evaluation and Pay Setting: Concepts and Practices, in Livernash, *supra* n. 6, at 49, 52–70.

that Congress in adopting the Equal Pay Act specifically addressed the problem of sex-based wage discrimination and determined that there should be a remedy for claims of unequal pay for equal work, but not for "comparable" work. Petitioners further observe that nothing in the legislative history of Title VII, enacted just one year later in 1964, reveals an intent to overrule that determination. Quite the contrary, petitioners note that the legislative history of Title VII, including the adoption of the so-called Bennett Amendment, demonstrates Congress' intent to require all sex-based wage discrimination claims, whether brought under the Equal Pay Act or under Title VII, to satisfy the "equal work" standard. Because respondents have not satisfied the "equal work" standard, petitioners conclude that they have not stated a claim under Title VII.

In rejecting that argument, the Court ignores traditional canons of statutory construction and relevant legislative history. Although I had thought it well settled that the legislative history of a statute is a useful guide to the intent of Congress, the Court today claims that the legislative history "has no bearing on the meaning of the [Act]," *ante,* at 173, n. 12, "does not provide a solution to the present problem," *ante,* at 176, and is simply of "no weight." *Ante,* at 176, n. 16. Instead, the Court rests its decision on its unshakable belief that any other result would be unsound public policy. It insists that there simply *must* be a remedy for wage discrimination *beyond* that provided in the Equal Pay Act. The Court does not explain *why* that must be so, nor does it explain *what* that remedy might be. And, of course, the Court cannot explain why it and not Congress is charged with determining what is and what is not sound public policy.

The closest the Court can come in giving a reason for its decision is its belief that interpretations of Title VII which "deprive victims of discrimination of a remedy, without clear congressional mandate" must be avoided. *Ante,* at 178. But that analysis turns traditional canons of statutory construc-

tion on their head.   It has long been the rule that when a legislature enacts a statute to protect a class of persons, the burden is on the plaintiff to show statutory coverage, not on the defendant to show that there is a "clear congressional mandate" for *excluding* the plaintiff from coverage.   Such a departure from traditional rules is particularly unwarranted in this case, where the doctrine of *in pari materia* suggests that all claims of sex-based wage discrimination are governed by the substantive standards of the previously enacted and more specific legislation, the Equal Pay Act.

Because the decision does not rest on any reasoned statement of logic or principle, it provides little guidance to employers or lower courts as to what types of compensation practices might now violate Title VII.   The Court correctly emphasizes that its decision is narrow, and indeed one searches the Court's opinion in vain for a hint as to what pleadings or proof other than that adduced in this particular case, see *ante,* at 180–181, would be sufficient to state a claim of sex-based wage discrimination under Title VII.   To paraphrase Justice Jackson, the Court today does not and apparently cannot enunciate any legal criteria by which suits under Title VII will be adjudicated and it lays "down no rule other than our passing impression to guide ourselves or our successors." *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28, 45 (1948). All we know is that Title VII provides a remedy when, as here, plaintiffs seek to show by *direct* evidence that their employer *intentionally* depressed their wages.   And, for reasons that go largely unexplained, we also know that a Title VII remedy may not be available to plaintiffs who allege theories different than that alleged here, such as the so-called "comparable worth" theory.   One has the sense that the decision today will be treated like a restricted railroad ticket, "good for this day and train only." *Smith* v. *Allwright,* 321 U. S. 649, 669 (1944) (Roberts, J., dissenting).

In the end, however, the flaw with today's decision is not so much that it is so narrowly written as to be virtually

meaningless, but rather that its legal analysis is wrong. The Court is obviously more interested in the consequences of its decision than in discerning the intention of Congress. In reaching its desired result, the Court conveniently and persistently ignores relevant legislative history and instead relies wholly on what it believes Congress *should* have enacted.

## II

*The Equal Pay Act*

The starting point for any discussion of sex-based wage discrimination claims must be the Equal Pay Act of 1963, enacted as an amendment to the Fair Labor Standards Act of 1938, 29 U. S. C. §§ 201–219 (1976 ed., Supp. III). It was there that Congress, after 18 months of careful and exhaustive study, specifically addressed the problem of sex-based wage discrimination. The Equal Pay Act states that employers shall not discriminate on the basis of sex by paying different wages for jobs that require equal skill, effort, and responsibility. In adopting the "equal pay for equal work" formula, Congress carefully considered and ultimately rejected the "equal pay for comparable worth" standard advanced by respondents and several *amici*. As the legislative history of the Equal Pay Act amply demonstrates, Congress realized that the adoption of the comparable-worth doctrine would ignore the economic realities of supply and demand and would involve both governmental agencies and courts in the impossible task of ascertaining the worth of comparable work, an area in which they have little expertise.

The legislative history of the Equal Pay Act begins in 1962 when Representatives Green and Zelenko introduced two identical bills, H. R. 8898 and H. R. 10226 respectively, representing the Kennedy administration's proposal for equal pay legislation. Both bills stated in pertinent part:

"SEC. 4. No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to

any employee at a rate less than the rate at which he pays wages to any employee of the opposite sex *for work of comparable character on jobs the performance of which requires comparable skills,* except where such payment is made pursuant to a seniority or merit increase system which does not discriminate on the basis of sex." H. R. 8898, 87th Cong., 1st Sess. (1961); H. R. 10226, 87th Cong., 2d Sess. (1962) (emphasis supplied).[1]

During the extensive hearings on the proposal, the administration strenuously urged that Congress adopt the "comparable" language, noting that the comparability of different jobs could be determined through job evaluation procedures. Hearings on H. R. 8898, H. R. 10226 before the Select Subcommittee on Labor of the House Committee on Education and Labor, 87th Cong., 2d Sess., 16, 27 (1962) (testimony of Secretary of Labor Arthur Goldberg and Assistant Secretary of Labor Esther Peterson). A bill containing the comparable-work formula, then denominated H. R. 11677, was reported out of the House Committee on Education and Labor and reached the full House. Once there, Representative St. George objected to the "comparable work" language of the bill and offered an amendment which limited equal pay claims to those "for equal work on jobs, the performance of which requires equal skills." 108 Cong. Rec. 14767 (1962). As she explained, her purpose was to limit wage discrimination claims

---

[1] Comparable work was not a new idea. During World War II the regulations of the National War Labor Board (NWLB) required equal pay for "comparable work." Under these regulations, the Board made job evaluations to determine whether pay inequities existed within a plant between dissimilar jobs. See *General Electric Co.,* 28 War Lab. Rep. 666 (1945). As a result, in every Congress since 1945, bills had been introduced mandating equal pay for "comparable work." In substituting the term "equal work" for "comparable work," Congress clearly rejected the approach taken by the NWLB.

to the situation where men and women were paid differently for performing the same job.

> "What we want to do in this bill is to make it exactly what it says. It is called equal pay for equal work in some of the committee hearings. *There is a great difference between the word 'comparable' and the word 'equal.'*
>
> .     .     .     .     .
>
> "... *The word 'comparable' opens up great vistas.* It gives tremendous latitude to whoever is to be arbitrator in these disputes." *Ibid.* (Emphasis supplied.)

Representative Landrum echoed those remarks. He stressed that the St. George amendment would prevent "the trooping around all over the country of employees of the Labor Department harassing business with their various interpretations of the term 'comparable' when 'equal' is capable of the same definition throughout the United States." *Id.,* at 14768. The administration, represented by Representatives Zelenko and Green, vigorously urged the House to reject the St. George amendment. They observed that the "equal work" standard was narrower than the existing "equal pay for comparable work" language and cited correspondence from Secretary of Labor Goldberg that "comparable is a key word in our proposal." *Id.,* at 14768–14769. The House, however, rejected that advice and adopted the St. George amendment. When the Senate considered the bill, it too rejected the "comparable work" theory in favor of the "equal work" standard.

Because the Conference Committee failed to report a bill out of Committee, enactment of equal pay legislation was delayed until 1963. Equal pay legislation, containing the St. George amendment, was reintroduced at the beginning of the session. The congressional debate on that legislation leaves no doubt that Congress clearly rejected the entire notion of "comparable worth." For example, Representative

Goodell, a cosponsor of the Act, stressed the significance of the change from "comparable work" to "equal work."[2]

"I think it is important that we have clear legislative history at this point. *Last year when the House changed the word 'comparable' to 'equal' the clear intention was to narrow the whole concept.* We went from 'comparable' to 'equal' meaning that the jobs involved should be virtually identical, that is, that they would be very much alike or closely related to each other.

"We do not expect the Labor Department to go into an establishment and attempt to rate jobs that are not equal. We do not want to hear the Department say, 'Well, they amount to the same thing,' and evaluate them so that they come up to the same skill or point. We expect this to apply only to jobs that are substantially identical or equal." 109 Cong. Rec. 9197 (1963) (emphasis supplied).

Representative Frelinghuysen agreed with those remarks.

"[W]e can expect that the administration of the ·equal pay concept, while fair and effective, will not be excessive nor excessively wide ranging. What we seek to insure, where men and women are doing the same job under the same working conditions[,] that they will receive the same pay. It is not intended that either the Labor Department or individual employees will be equipped with hunting licenses.

.        .        .        .        .

" . . . *[The EPA] is not intended to compare unrelated jobs, or jobs that have been historically and normally considered by the industry to be different." Id.*, at 9196 (emphasis supplied).[3]

---

[2] Statements made by the sponsors of legislation "deserv[e] to be accorded substantial weight in interpreting the statute." *FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 564 (1976); *Schwegmann Brothers* v. *Calvert Distillers Corp.*, 341 U. S. 384, 394 (1951).

[3] Representative Goodell rejected any type of wage comparisons between

Thus, the legislative history of the Equal Pay Act clearly reveals that Congress was unwilling to give either the Federal Government or the courts broad authority to determine comparable wage rates. Congress recognized that the adoption of such a theory would ignore economic realities and would result in major restructuring of the American economy. Instead, Congress concluded that governmental intervention to equalize wage differentials was to be undertaken only within one circumstance: when men's and women's jobs were identical or nearly so, hence unarguably of equal worth. It defies common sense to believe that the same Congress—which, after 18 months of hearings and debates, had decided in 1963 upon the extent of federal involvement it desired in the area of wage rate claims—intended *sub silentio* to reject all of this work and to abandon the limitations of the equal work approach just one year later, when it enacted Title VII.

## Title VII

Congress enacted the Civil Rights Act of 1964, 42 U. S. C. § 2000a *et seq.*, one year after passing the Equal Pay Act. Title VII prohibits discrimination in employment on the basis of race, color, national origin, religion, and sex. 42 U. S. C. § 2000e–2 (a)(1). The question is whether Congress intended to completely turn its back on the "equal work" standard enacted in the Equal Pay Act of 1963 when it adopted Title VII only one year later.

men and women as the basis for relief. He stated: "We do not have in mind the Secretary of Labor's going into an establishment and saying, 'Look you are paying the women here $1.75 and the men $2.10. Come on in here, Mr. Employer, and you prove that you are not discriminating on the basis of sex.' That would be just the opposite of what we are doing." 109 Cong. Rec. 9208 (1963). Similarly, Representative Griffin noted that the "equal work" standard meant that the jobs of inspector and assembler could not be compared, nor could inspectors who inspect complicated parts be compared to inspectors making simple cursory inspections. *Id.*, at 9197. Representative Thompson, one of the original sponsors of the equal pay legislation, agreed with Representative Griffin's examples. *Id.*, at 9198.

The Court answers that question in the ·affirmative, concluding that Title VII must be read more broadly than the Equal Pay Act. In so holding, the majority wholly ignores this Court's repeated adherence to the doctrine of *in pari materia,* namely, that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148, 153 (1976), citing *Morton* v. *Mancari,* 417 U. S. 535, 550–551 (1974); *United States* v. *United Continental Tuna Corp.,* 425 U. S. 164, 169 (1976). In *Continental Tuna,* for example, the lower court held that an amendment to the Suits in Admiralty Act allowed plaintiffs to sue the United States under that Act and ignore the applicable and more stringent provisions of the previously enacted Public Vessels Act. We rejected that construction because it amounted to a repeal of the Public Vessels Act by implication. We recognized that such an evasion of the congressional purpose reflected in the restrictive provisions would not be permitted absent some clear statement by Congress that such was intended by the later statute. Similarly, in *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1 (1976), this Court rejected a construction of the Federal Water Control Act which would have substantially altered the regulation scheme established under the Atomic Energy Act, without a "clear indication of legislative intent." *Id.,* at 24.

When those principles are applied to this case, there can be no doubt that the Equal Pay Act and Title VII should be construed *in pari materia.* The Equal Pay Act is the more specific piece of legislation, dealing solely with sex-based wage discrimination, and was the product of exhaustive congressional study. Title VII, by contrast, is a general antidiscrimination provision, passed with virtually no consideration of the specific problem of sex-based wage discrimination. See *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 143 (1976) (the legislative history of the sex discrimination amendment

is "notable primarily for its brevity").[4] Most significantly, there is absolutely nothing in the legislative history of Title VII which reveals an intent by Congress to repeal by implication the provisions of the Equal Pay Act. Quite the contrary, what little legislative history there is on the subject— such as the comments of Senators Clark and Bennett and Representative Celler, and the contemporaneous interpretation of the EEOC—indicates that Congress intended to incorporate the substantive standards of the Equal Pay Act into Title VII so that sex-based wage discrimination claims would be governed by the equal work standard of the Equal Pay Act and by that standard alone. See discussion *infra,* at 190–197.

In order to the reach the result it so desperately desires, the Court neatly solves the problem of this contrary legislative history by simply giving it "no weight." *Ante,* at 172, n. 12, 176, and n. 16. But it cannot be doubted that Chief Justice Marshall stated the correct rule that "[w]here the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived . . . ." *United States* v. *Fisher,* 2 Cranch 358, 386 (1805). In this case, when all of the pieces of legislative history are considered *in toto,* the Court's version of the legislative history of Title VII is barely plausible, say nothing of convincing.

Title VII was first considered by the House, where the prohibition against sex discrimination was added on the House floor. When the bill reached the Senate it bypassed the

---

[4] Indeed, Title VII was originally intended to protect the rights of Negroes. On the final day of consideration by the entire House, Representative Smith added an amendment to prohibit sex discrimination. It has been speculated that the amendment was added as an attempt to thwart passage of Title VII. The amendment was passed by the House that same day, and the entire bill was approved two days later and sent to the Senate without any consideration of the effect of the amendment on the Equal Pay Act. The attenuated history of the sex amendment to Title VII makes it difficult to believe that Congress thereby intended to wholly abandon the carefully crafted equal work standard of the Equal Pay Act.

Senate Committee system and was presented directly to the full Senate. It was there that concern was expressed about the relation of the Title VII sex discrimination ban to the Equal Pay Act. In response to questions by Senator Dirksen, Senator Clark, the floor manager for the bill, prepared a memorandum in which he attempted to put to rest certain objections which he believed to be unfounded. Senator Clark's answer to Senator Dirksen reveals that Senator Clark believed that all cases of wage discrimination under Title VII would be treated under the standards of the Equal Pay Act:

> "*Objection.* The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. *They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.*
>
> "*Answer.* The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike title VII. Furthermore, under title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bona fide occupational qualification. *The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under title VII.*" 110 Cong. Rec. 7217 (1964) (emphasis added).

In this passage, Senator Clark asserted that the sex discrimination provisions of Title VII were necessary, notwithstanding the Equal Pay Act, because (a) the Equal Pay Act had numerous exemptions for various types of businesses, and (b) Title VII covered discrimination in access (*e. g.,* assignment and promotion) to jobs, not just compensation. In addition, Senator Clark made clear that in the compensation area the equal work standard would continue to be the ap-

plicable standard. He explained, in answer to Senator Dirksen's concern, that when *different jobs* were at issue, the Equal Pay Act's legal standard—the "equal work" standard—would apply to limit the reach of Title VII. Thus Senator Clark rejected as unfounded the objections that the sex provisions of Title VII were unnecessary on the one hand or extended beyond the equal work standard on the other.

Notwithstanding Senator Clark's explanation, Senator Bennett remained concerned that, absent an explicit cross-reference to the Equal Pay Act, the "wholesale insertion" of the word "sex" in Title VII could nullify the carefully conceived Equal Pay Act standard. 110 Cong. Rec. 13647 (1964). Accordingly, he offered, and the Senate accepted, the following amendment to Title VII:

> "It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of [§ 6 (d) of the Equal Pay Act]."

Although the language of the Bennett Amendment is ambiguous, the most plausible interpretation of the Amendment is that it incorporates the substantive standard of the Equal Pay Act—the equal pay for equal work standard—into Title VII. A number of considerations support that view. In the first place, that interpretation is wholly consistent with, and in fact confirms, Senator Clark's earlier explanation of Title VII. Second, in the limited time available to Senator Bennett when he offered his amendment—the time for debate having been limited by cloture—he explained the Amendment's purpose.[5]

> "Mr. President, after many years of yearning by mem-

---

[5] The Court makes far too much of the fact that Senator Bennett's Amendment was designated a "technical amendment." It is apparently

bers of the fair sex in this country, and after very careful study by the appropriate committees of Congress, last year Congress passed the so-called Equal Pay Act, which became effective only yesterday.

"By this time, programs have been established for the effective administration of this act. Now when the civil rights bill is under consideration, in which the word 'sex' has been inserted in many places, I do not believe sufficient attention may have been paid to possible conflicts between the wholesale insertion of the word 'sex' in the bill and in the Equal Pay Act.

*"The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified."* 110 Cong. Rec. 13647 (1964) (emphasis supplied).

It is obvious that the principal way in which the Equal Pay Act could be "nullified" would be to allow plaintiffs unable to meet the "equal pay for equal work" standard to proceed under Title VII asserting some other theory of wage discrimination, such as "comparable worth." If plaintiffs can proceed under Title VII without showing that they satisfy the "equal work" criterion of the Equal Pay Act, one would expect all plaintiffs to file suit under the "broader" Title VII standard. Such a result would, for all practical purposes, constitute an implied repeal of the equal work standard of the Equal Pay Act and render that Act a nullity. This was precisely the result Congress sought to avert when it adopted the Bennett Amendment, and the result the Court today embraces.

---

the Court's belief that a "technical amendment" is an insignificant one. The Amendment, however, was so designated simply because (1) the Amendment confirmed the general intention of the Senate evinced by Senator Clark's earlier explanation of Title VII, and (2) the time for debate had been limited by the invocation of cloture, leaving a "technical amendment" as the most expeditious way of introducing an amendment. Senator Bennett later explained all of this. 111 Cong. Rec. 13359 (1965).

Senator Bennett confirmed this interpretation just one year later. The Senator expressed concern as to the proper interpretation of his Amendment and offered his written understanding of the Amendment.

> "The Amendment therefore means that it is not an unlawful employment practice: . . . (b) to have different standards of compensation for nonexempt employees, where such differentiation is not prohibited by the equal pay amendment to the Fair Labor Standards Act.
>
> "Simply stated, *the [Bennett] amendment means that discrimination in compensation on account of sex does not violate title VII unless it also violates the Equal Pay Act.*" 111 Cong. Rec. 13359 (1965) (emphasis supplied).

Senator Dirksen agreed that this interpretation was "precisely" the one that he, Senator Humphrey, and their staffs had in mind when the Senate adopted the Bennett Amendment. *Id.,* at 13360. He added: "I trust that that will suffice to clear up in the minds of anyone, whether in the Department of Justice or elsewhere, what the Senate intended when that amendment was accepted." *Ibid.*[6]

---

[6] There is undoubtedly some danger in relying on subsequent legislative history. But that does not mean that such subsequent legislative history is wholly irrelevant, particularly where, as here, the *sponsor* of the legislation makes a clarifying statement which is not inconsistent with the prior ambiguous legislative history. See *Galvan* v. *Press,* 347 U. S. 522, 526–527 (1954) (Court relied on a 1951 memorandum by Senator McCarran in interpreting the meaning of a 1950 statute he sponsored).

The Court suggests Senator Bennett's 1965 comments should be discounted because Senator Clark criticized them. *Ante,* at 176, n. 16. Senator Clark did indeed criticize Senator Bennett, but only because Senator Clark read Senator Bennett's explanation as suggesting that Title VII protection would not be available to those employees not within the Equal Pay Act's coverage. Senator Clark's view was that employees not covered by the Equal Pay Act could still bring Title VII claims. He did not dispute, however, the proposition that the "equal work" standard of the Equal Pay Act was incorporated into Title VII claims. Quite the con-

We can glean further insight into the proper interpretation of the Bennett Amendment from the comments of Representative Celler, the Chairman of the House Judiciary Committee and sponsor of Title VII. After the Senate added the Bennett Amendment to Title VII and sent the bill to the House, Representative Celler set out in the record the understanding of the House that sex-based compensation claims would not satisfy Title VII unless they met the equal work standards of the Equal Pay Act. He explained that the Bennett Amendment "[p]rovides that compliance with the [EPA] satisfies the requirement of the title barring discrimination because of sex—[§ 703 (h)]." 110 Cong. Rec. 15896 (1964). The majority discounts this statement because it is somewhat "imprecise." *Ante,* at 176. I find it difficult to believe that a comment to the full House made by the sponsor of Title VII, who obviously understood its provisions, including its amendments, is of no aid whatsoever to the inquiry before us.[7]

Finally, the contemporaneous interpretations of the Bennett Amendment by the EEOC, which are entitled to great

---

trary, Senator Clark placed into the record a letter from the Chairman of the National Committee for Equal Pay which stated:

"Our best understanding of the implications of the [Bennett Amendment] at the time it was adopted was that its intent and effect was to make sure that equal pay would be applied and interpreted under the Civil Rights Act in the same way as under the earlier statute, the Equal Pay Act. *That is, the Equal Pay Act standards requiring equal work . . . would also be applied under the Civil Rights Act."* 111 Cong. Rec. 18263 (1965) (emphasis supplied).

Senator Clark then commended to the EEOC the reasoning set forth in the letter. *Ibid.*

[7] In light of the foregoing, the Court's statement that no Senator or Congressman mentioned the "equal work" standard is mystifying. *Ante,* at 174, n. 13. Senator Clark, for example, discussed it twice. See *supra,* at 191–192; n. 6, *supra.* Indeed, it is the Court's theory—that only the affirmative defenses are incorporated into Title VII—that is not "so much as mentioned" by any "Senator or Congressman." See *infra,* at 198–199.

weight since they were issued while the intent of Congress was still fresh in the administrator's mind, further buttresses petitioners' interpretation of the Amendment. *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965); *General Electric Co.* v. *Gilbert,* 429 U. S., at 142. The EEOC interpretations clearly state that the Equal Pay Act's equal work standard is incorporated into Title VII as the standard which must be met by plaintiffs alleging sex-based compensation claims under Title VII. The Commission's 1965 Guidelines on Discrimination Because of Sex explain:

> "Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6 (d) of the Fair Labor Standards Act of 1938, 29 U. S. C. § 206 (d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable. *Accordingly, the Commission interprets section 703 (h) to mean that the standards of 'equal pay for equal work' set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII.* However, it is the judgment of the Commission that the employee coverage of the prohibition against discrimination in compensation because of sex is coextensive with that of the other prohibitions in section 703, and is not limited by § 703 (h) to those employees covered by the Fair Labor Standards Act." 29 CFR § 1604.7 (1966). (Emphasis supplied.)

Three weeks after the EEOC issued its Guidelines, the General Counsel explained the Guidelines in an official opinion letter.[8] He explained:

> "The Commission, as indicated in § 1604.7 of the

---

[8] Other opinion letters issued by the EEOC General Counsel during the 1960's confirmed that Title VII would not be violated unless equal work was performed. The General Counsel's opinion of May 4, 1966, explains:

"It follows that an employer covered by Title VII may not pay a male less than the California minimum wage while paying the statutory rate

Guidelines issued Novémber 24, 1965, 30 F. R. 14928, has decided that section 703 (h), Title VII of the Civil Rights Act of 1964 *incorporates the definition of discrimination in compensation found in the Equal Pay Act, including the four enumerated exceptions . . . ."* General Counsel's opinion of December 29, 1965, App. to Brief for Petitioners 7a. (Emphasis supplied.)

Thus EEOC's contemporaneous interpretation of the Bennett Amendment leaves no room for doubt: The Bennett Amendment incorporates the equal work standard of discrimination into Title VII.[9]

to a woman for the same job. . . . *[W]hatever the general rule may be under Title VII, the Bennett Amendment compels us to apply the same test for differences in compensation based on sex.* 29 CFR 1604.7." App. to Brief for Petitioners 11a–13a.

The General Counsel's opinion of February 28, 1966, stresses that "where an employer pays a certain wage to employees of one sex in order to comply with such a law, he must also pay the same rate to employees of the opposite sex for equal work [under Title VII]." *Id.,* at 9a–10a. The Commissioner's opinion of July 23, 1966, states that "[a]ssuming that male and female laborers perform the same functions . . . a wage differential would violate [Title VII]." *Id.,* at 16a.

And the Acting General Counsel's Memorandum of June 6, 1967, made clear that the Equal Pay Act's equal work standard, *i. e.,* equal skill, effort, responsibility, and working conditions, as well as the Equal Pay Act's affirmative defenses, *i. e.,* seniority systems, merit systems, etc., were incorporated by the phrase "authorize" in the Bennett Amendment. As he interpreted the word "authorize":

"*Differentiations which are authorized under said section [703 (h)] are differentiations on the basis of skill, effort, responsibility and working conditions,* and differentiations related to a seniority system, a merit system, a system which measures earnings by quantity or quality of production or a differential based on any other factor than sex.

"It is the interpretation of these provisions that requires harmonization between Title VII and the Equal Pay [Act] because these are the provisions which, within the meaning of § 70[3] (h), 'authorize' differentiations." *Id.,* at 21a–22a. (Emphasis supplied.)

[9] The EEOC has since changed its mind as to the relationship between Title VII and the Equal Pay Act. But this Court has recognized that

198

The Court blithely ignores all of this legislative history and chooses to interpret the Bennett Amendment as incorporating only the Equal Pay Act's four affirmative defenses, and not the equal work requirement.[10]  That argument does not survive scrutiny.  In the first place, the language of the Amendment draws no distinction between the Equal Pay Act's standard for liability—equal pay for equal work—and the Act's defenses.  Nor does any Senator or Congressman

---

"an EEOC guideline is not entitled to great weight where . . . it varies from prior EEOC policy and no new legislative history has been introduced in support of the change".  *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63, 76, n. 11 (1977).  See *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 142 (1976) (Court discounted weight to be given to the 1972 Title VII regulations addressing pregnancy benefits because they were inconsistent with the 1965 regulations).

[10] In reaching this conclusion, the Court relies far too heavily on a definition of the word "authorize."  Rather than "make a fortress out of the dictionary," *Cabell* v. *Markham,* 148 F. 2d 737, 739 (CA2), aff'd, 326 U. S. 404 (1945), the Court should instead attempt to implement the legislative intent of Congress.  Even if dictionary definitions were to be our guide, the word "authorized" has been defined to mean exactly what petitioners contend.  Black's Law Dictionary 169 (4th ed. 1968) defines "authorized" to mean "[t]o permit a thing to be done in the future."  Accordingly, the language of the Bennett Amendment suggests that those differentiations which are authorized under the Equal Pay Act—and thus Title VII—are those based on "skill, effort, responsibility and working conditions" and those related to the four affirmative defenses.  See n. 7, *supra.*

Respondents also rely on Senator Dirksen's brief reference to "exceptions to the basic Act . . . ."  That statement is highly ambiguous and is too thin a reed to support their conclusion that Congress intended to incorporate only the Equal Pay Act's affirmative defenses.  First, as even the Court concedes, *ante,* at 175, the reference to the "exceptions" probably refers to the exemptions from coverage of the Fair Labor Standards Act, not to the Equal Pay Act's four defenses.  Second, it was Senator Dirksen who first raised the objection, answered by Senator Clark, that Title VII would reject the equal work requirement.  And third, in 1965 Senator Dirksen explicitly agreed with Senator Bennett's interpretation of the Amendment.  See *supra,* at 194.  It thus is highly unlikely that Senator Dirksen would have been interested in preserving either the exceptions or the affirmative defenses, but not the "equal work" standard.

even come close to suggesting that the Amendment incorporates the Equal Pay Act's affirmative defenses into Title VII, but not the equal work standard itself. Quite the contrary, the concern was that Title VII would render the Equal Pay Act a nullity. It is only too obvious that reading just the four affirmative defenses of the Equal Pay Act into Title VII does not protect the careful draftsmanship of the Equal Pay Act. We must examine statutory words in a manner that " 'reconstitute[s] the gamut of values current at the time when the words were uttered.' " *National Woodwork Manufacturers Assn.* v. *NLRB,* 386 U. S. 612, 620 (1967) (quoting L. Hand, J.). In this case, it stands Congress' concern on its head to suppose that Congress sought to incorporate the affirmative defenses, but not the equal work standard. It would be surprising if Congress in 1964 sought to reverse its decision in 1963 to require a showing of "equal work" as a predicate to an equal pay claim and at the same time carefully preserve the four affirmative defenses.

Moreover, even on its own terms the Court's argument is unpersuasive. The Equal Pay Act contains four statutory defenses: different compensation is permissible if the differential is made by way of (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) is based on any other factor other than sex. 29 U. S. C. § 206 (d)(1). The flaw in interpreting the Bennett Amendment as incorporating only the four defenses of the Equal Pay Act into Title VII is that Title VII, even without the Bennett Amendment, contains those very same defenses.[11] The opening sentence of

---

[11] Under the Court's analysis, § 703 (h) consists of two redundant sentences:

"[1] Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations . . . . [2] [The Bennett Amendment] It shall not be an unlawful employment

§ 703 (h) protects differentials and compensation based on seniority, merit, or quantity or quality of production. These are three of the four EPA defenses. The fourth EPA defense, "a factor other than sex," is already implicit in Title VII because the statute's prohibition of sex discrimination applies only if there is discrimination on the basis of sex. Under the Court's interpretation, the Bennett Amendment, the second sentence of § 703 (h), is mere surplusage. *United States* v. *Menasche,* 348 U. S. 528, 538–539 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,' *Montclair* v. *Ramsdell,* 107 U. S. 147, 152, rather than emasculate an entire section").[12] The Court's answer to this argument is curious. It suggests that repetition ensures that the provisions would be consistently interpreted by the courts. *Ante,* at 170. But that answer only speaks to the purpose for incorporating the defenses in each statute, not for stating the defenses twice in the same statute. Courts are not quite as dense as the majority assumes.

In sum, Title VII and the Equal Pay Act, read together, provide a balanced approach to resolving sex-based wage discrimination claims. Title VII guarantees that qualified female employees will have access to all jobs, and the Equal Pay Act assures that men and women performing the same work will be paid equally. Congress intended to remedy wage discrimination through the Equal Pay Act standards, whether suit is brought under that statute or under Title

---

practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid . . . [except pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex]."

[12] In 1965, Senator Bennett himself made this point. He stressed that "[the language setting out the defenses] is merely clarifying language similar to that which was already in section 703 (h). If the Bennett amendment was simply intended to incorporate by reference these exceptions into subsection (h), the amendment would have no substantive effect." 111 Cong. Rec. 13359 (1965).

VII. What emerges is that Title VII would have been construed *in pari materia* even without the Bennett Amendment, and that the Amendment serves simply to insure that the equal work standard would be the standard by which all wage compensation claims would be judged.

### III

Perhaps recognizing that there is virtually no support for its position in the legislative history, the Court rests its holding on its belief that any other holding would be unacceptable public policy. *Ante,* at 178–180. It argues that there must be a remedy for wage discrimination beyond that provided for in the Equal Pay Act. Quite apart from the fact that that is an issue properly left to Congress and not the Court, the Court is wrong even as a policy matter. The Court's parade of horribles that would occur absent a distinct Title VII remedy simply does not support the result it reaches.

First, the Court contends that a separate Title VII remedy is necessary to remedy the situation where an employer admits to a female worker, hired for a unique position, that her compensation would have been higher had she been male. *Ante,* at 178–179. Stated differently, the Court insists that an employer could isolate a predominantly female job category and arbitrarily cut its wages because no men currently perform equal or substantially equal work. But a Title VII remedy is unnecessary in these cases because an Equal Pay Act remedy is available. Under the Equal Pay Act, it is not necessary that every Equal Pay Act violation be established through proof that members of the opposite sex are *currently* performing equal work for greater pay. However unlikely such an admission might be in the bullpen of litigation, an employer's statement that "if my female employees performing a particular job were males, I would pay them more simply because they are males" would be admissible in a suit under that Act. Overt discrimination does not go unremedied by the Equal Pay Act. See *Bourque* v. *Powell Elec-*

*trical Manufacturing Co.,* 617 F. 2d 61 (CA5 1980); *Peltier v. City of Fargo,* 533 F. 2d 374 (CA8 1976); *International Union of Electrical Workers v. Westinghouse Electric Corp.,* 631 F. 2d 1094, 1108, n. 2 (CA3 1980) (Van Dusen, J., dissenting). In addition, insofar as hiring or placement discrimination caused the isolated job category, Title VII already provides numerous remedies (such as backpay, transfer, and constructive seniority) without resort to job comparisons. In short, if women are limited to low paying jobs against their will, they have adequate remedies under Title VII for denial of job opportunities even under what I believe is the correct construction of the Bennett Amendment.

The Court next contends that absent a Title VII remedy, women who work for employers exempted from coverage of the Equal Pay Act would be wholly without a remedy for wage discrimination. *Ante,* at 179–180. The Court misapprehends petitioners' argument. As Senator Clark explained in his memorandum, see *supra,* at 191–192, Congress sought to incorporate into Title VII the substantive standard of the Equal Pay Act—the "equal work" standard—not the employee coverage provisions. See *supra,* at 194–195, n. 6. Thus, to say that the "equal pay for equal work" standard is incorporated into Title VII does not mean that employees are precluded from bringing compensation discrimination claims under Title VII. It means only that if employees choose to proceed under Title VII, they must show that they have been deprived of "equal pay for equal work."

There is of course a situation in which petitioners' position *would* deny women a remedy for claims of sex-based wage discrimination. A remedy would not be available where a lower paying job held primarily by women is "comparable," but not substantially equal to, a higher paying job performed by men. That is, plaintiffs would be foreclosed from showing that they received unequal pay for work of "comparable worth" or that dissimilar jobs are of "equal worth." The short, and best, answer to that contention is that Congress

in 1963 explicitly chose not to provide a remedy in such cases. And contrary to the suggestion of the Court, it is by no means clear that Title VII was enacted to remedy *all* forms of alleged discrimination. We recently emphasized for example, that "Title VII could not have been enacted into law without substantial support from legislators in both Houses who traditionally resisted federal regulation of private business. Those legislators demanded as a price for their support that 'management prerogatives, and union freedoms . . . be left undisturbed to the greatest extent possible.' " *Steelworkers* v. *Weber,* 443 U. S. 193, 206 (1979). See *Mohasco Corp.* v. *Silver,* 447 U. S. 807, 820 (1980) (a 90-day statute of limitations may have "represented a necessary sacrifice of the rights of some victims of discrimination in order that a civil rights bill could be enacted"). Congress balanced the need for a remedy for wage discrimination against its desire to avoid the burdens associated with governmental intervention into wage structures. The Equal Pay Act's "equal pay for equal work" formula reflects the outcome of this legislative balancing. In construing Title VII, therefore, the courts cannot be indifferent to this sort of political compromise.

## IV

Even though today's opinion reaches what I believe to be the wrong result, its narrow holding is perhaps its saving feature. The opinion does not endorse the so-called "comparable worth" theory: though the Court does not indicate how a plaintiff might establish a prima facie case under Title VII, the Court does suggest that allegations of unequal pay for unequal, but comparable, work will not state a claim on which relief may be granted. The Court, for example, repeatedly emphasizes that this is not a case where plaintiffs ask the court to compare the value of dissimilar jobs or to quantify the effect of sex discrimination on wage rates. *Ante,* at 166, 180–181. Indeed, the Court relates, without criticism, respondents' contention that *Lemons* v. *City and County of*

*Denver,* 620 F. 2d 228 (CA10), cert. denied, 449 U. S. 888 (1980), is distinguishable. *Ante,* at 166, n. 7. There the court found that Title VII did not provide a remedy to nurses who sought increased compensation based on a comparison of their jobs to dissimilar jobs of "comparable" value in the community. See also *Christensen* v. *Iowa,* 563 F. 2d 353 (CA8 1977) (no prima facie case under Title VII when plaintiffs, women clerical employees of a university, sought to compare their wages to the employees in the physical plant).

Given that implied repeals of legislation are disfavored, *TVA* v. *Hill,* 437 U. S. 153, 189 (1978), we should not be surprised that the Court disassociates itself from the entire notion of "comparable worth." In enacting the Equal Pay Act in 1963, Congress specifically prohibited the courts from comparing the wage rates of dissimilar jobs: there can only be a comparison of wage rates where jobs are "equal or substantially equal." Because the legislative history of Title VII does not reveal an intent to overrule that determination, the courts should strive to harmonize the intent of Congress in enacting the Equal Pay Act with its intent in enacting Title VII. Where, as here, the policy of prior legislation is clearly expressed, the Court should not "transfuse the successor statute with a gloss of its own choosing." *De Sylva* v. *Ballentine,* 351 U. S. 570, 579 (1956).

Because there are no logical underpinnings to the Court's opinion, all we may conclude is that even absent a showing of equal work, there is a cause of action under Title VII where there is direct evidence that an employer has *intentionally* depressed a woman's salary because she is a woman. The decision today does not approve a cause of action based on a *comparison* of the wage rates of dissimilar jobs.

For the foregoing reasons, however, I believe that even that narrow holding cannot be supported by the legislative history of the Equal Pay Act and Title VII. This is simply a case where the Court has superimposed upon Title VII a "gloss of its own choosing."