IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-20324

Summary Calendar
_____

JOSE CARTAGENA

                              Plaintiff - Appellant

        v.

AEGIS MORTGAGE CORPORATION, INC, ET AL

                              Defendant

AEGIS MORTGAGE CORPORATION, INC

                              Defendant - Appellee

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. H-00-CV-1548
_____

October 16, 2001

Before KING, Chief Judge, and DAVIS and EMILIO M. GARZA, Circuit
Judges.

PER CURIAM:[*]

    Plaintiff-Appellant Jose Cartagena appeals the district

court's judgment in favor of Defendant-Appellee Aegis Mortgage

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Corporation on Cartagena's claims of employment discrimination. For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In May 1997, Defendant-Appellee Aegis Mortgage Corporation ("Aegis") hired Plaintiff-Appellant Jose Cartagena, a Hispanic male, as manager of its government insurance department. Almost two years later, in February 1999, Aegis discharged Cartagena.

On the day before Cartagena was discharged, he overheard Jennifer Marquez, one of the employees working under him, tell Suzanne Janzack, another employee working under him, about an alleged affair between Janzack and Cartagena. Cartagena approached Marquez and asked her to reveal the source of her information. Marquez refused, and, according to Cartagena, he told Marquez that they would discuss the matter the following morning with the president of Aegis. After Cartagena left the office, Marquez reported the incident first to Deborah Nelson, who was then a vice president, and then, at Nelson's suggestion, to Terry Nagle, Cartagena's immediate supervisor. Marquez told Nelson and Nagle that Cartagena had threatened her when she refused to reveal who had told her about Cartagena's alleged affair with Janzack.

Nagle related Marquez's account of her encounter with Cartagena to Robert Ward, an executive vice president of Aegis, who agreed with Nagle that Cartagena should be discharged. Nagle

2

discharged Cartagena when he arrived at work on the morning of February 11, 1999, the day following the incident with Marquez. Pamela Whitford, a white female, worked as manager of the government insurance department for one month after Cartagena's discharge. During that time, Whitford was not paid by Aegis, but rather by the employment agency that Aegis had retained to fill Cartagena's position.

On May 5, 2000, Cartagena filed suit in federal district court against Aegis,[1] alleging various violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). Specifically, Cartagena claimed (1) racial and gender discrimination in the form of unequal compensation and discharge in violation of § 2000e-2(a)(1), and (2) retaliation for opposing sexual harassment in violation of § 2000e-3(a). Each party filed summary judgment motions, and on February 22, 2001, the district court issued summary judgment against Cartagena on all his Title VII claims and denied as moot all pending procedural motions, including Cartagena's motion for reconsideration of the district court's previous denial of his requests for interrogatories and document production. Cartagena timely appealed, challenging the summary judgment on each of his Title VII claims and the denial of his discovery requests.

---

[1] Cartagena also named Marquez and Nagle as defendants, but the district court dismissed them from the case on July 24, 2000. Cartagena does not challenge their dismissal on appeal.

## II. PROPRIETY OF THE SUMMARY JUDGMENT DISMISSING
## THE TITLE VII CLAIMS

### *A. Standard of Review*

We review a district court's grant of summary judgment de novo, applying the same Rule 56 standard as the district court. Blow v. City of San Antonio, 236 F.3d 293, 296 (5th Cir. 2001) (citing FED. R. CIV. P. 56). "Although summary judgment is not favored in claims of employment discrimination, it is nonetheless proper when 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" Waggoner v. City of Garland, 987 F.2d 1160, 1164 (5th Cir. 1993) (quoting FED. R. CIV. P. 56(c)). In reviewing a summary judgment decision, this court bears in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Accordingly, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Bishop, 238 F.3d 586, 589 (5th Cir. 2000).

If the moving party shows that there is no genuine issue of material fact, then the burden shifts to the nonmoving party, who "may not rest upon the mere allegations or denials of the

4

[moving] party's pleadings," but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). After the nonmoving party has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for that party, summary judgment is proper. See FED. R. CIV. P. 56(c); Anderson, 477 U.S. at 252.

### B.  The McDonnell Douglas Analytical Framework

In McDonnell Douglas Corp. v. Green, the Supreme Court set forth the burden-shifting framework for proving a claim of intentional discrimination by circumstantial evidence. See 411 U.S. 792, 80-04 (1973). First, the plaintiff must establish a prima facie case of discrimination. Id. at 802. The elements of the prima facie case vary depending on the type of adverse employment action that the plaintiff claims was the result of unlawful discrimination. See Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio, No. 00-50092, 2001 WL 897189 (5th Cir. Aug. 24, 2001); see also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

By establishing a prima facie case, the plaintiff raises a "mandatory inference of discrimination." Russell v. McKinney

Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981)). To rebut that inference of discrimination, the defendant must produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action on which the discrimination claim is based. McDonnell Douglas, 411 U.S. at 802. The defendant's burden "is only one of production, not persuasion, involving no credibility assessments." Russell, 235 F.3d at 222; see also Burdine, 450 U.S. at 253 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").

If the defendant defeats the inference of discrimination raised by the plaintiff's prima facie case, "the ultimate question" remaining for the trier of fact is "whether [the] plaintiff has proven [intentional discrimination]." Russell, 235 F.3d at 222 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)) (alterations in original). In most cases, a plaintiff will make a showing of intentional discrimination sufficient to survive summary judgment by relying on the prima facie case and on evidence that the defendant's nondiscriminatory explanation for the adverse employment action is pretextual. See Reeves, 530 U.S. at 147-48; Russell, 235 F.3d at 223.

### C. Application of the Framework

6

Although Cartagena clearly failed to establish prima facie cases of discriminatory compensation and retaliation, the question whether he succeeded in establishing a prima facie case of discriminatory discharge is less clear. However, summary judgment was nevertheless proper because the district court correctly concluded that Cartagena failed to present sufficient evidence that Aegis's nondiscriminatory explanation for discharging Cartagena was a mere pretext for discrimination.

### 1. Discriminatory Discharge

To establish a prima facie case of discriminatory discharge, Cartagena must show that (1) he is a member of a protected class, (2) he was discharged, (3) he was otherwise qualified for the position from which he was discharged, and (4) that he was replaced by an individual outside his protected class. <u>Reeves</u>, 530 U.S. at 142. Cartagena is a Hispanic male who was discharged from a position for which he was qualified, and he was replaced by Pamela Whitford, a white female. Aegis apparently argues that the fourth element of the prima facie case is not met because Whitford's employer was an employment agency rather than Aegis. Aegis claims that <u>it</u> hired Whitford for a different position, after eliminating the position that Cartagena had held. We need not determine the legal import of such circumstances to resolve this appeal. Assuming Cartagena established a prima facie case, summary judgment against him was still proper because he failed

to present sufficient evidence that Aegis's nondiscriminatory explanation was a pretext for discrimination.

Aegis met its burden of producing a nondiscriminatory, legitimate reason for discharging Cartagena. According to Nagle (Cartagena's immediate supervisor) and Ward (the executive vice president who approved Nagle's decision to discharge Cartagena), they agreed that Nagle should discharge Cartagena because they believed Marquez's claim that Cartagena had threatened her. Nagle and Nelson (the then vice president to whom Marquez first reported the incident) both stated in their depositions that Marquez reported to them that Cartagena had told her that if she would not reveal the source of the rumors about his alleged affair, then "something would happen to her." Nagle and Nelson also both stated that Marquez appeared frightened when she came into their offices after the incident with Cartagena.

Standing alone, Marquez's allegation that Cartagena threatened her satisfies Aegis's burden of producing a legitimate, nondiscriminatory reason that rebuts the inference of discrimination raised by Cartagena's prima facie case. However, Aegis also points to prior incidents that it claims contributed to its decision to discharge Cartagena. Nagle stated in her deposition that one of the reasons why she believed Marquez's account was that Caryn Landauer, a former Aegis employee who had also worked under Cartagena, had resigned because she was afraid of Cartagena. According to both Nagle and Ward, Landauer was so

8

intimidated by Cartagena that she asked Ward and Nagle not to tell Cartagena the reason for her resignation.

Nagle also stated that employees in addition to Landauer and Marquez had reported that they "were afraid of [Cartagena]" and that "he was rude to them, short with them, and occasionally would not help them when they asked for help."  Nagle further stated that she had questioned Cartagena's managerial competence several times throughout his employment with Aegis, such as when she saw him touching female employees in inappropriate ways (including Landauer), when he refused to turn his personal time sheets in to her, when customers of Aegis complained about the way Cartagena treated them, and when other supervisors complained to her that Cartagena was instructing the employees in their departments.

Where, as here, the defendant claims that it discharged the plaintiff primarily because of complaints about the plaintiff by fellow employees, the pretext "inquiry is limited to whether the employer believed the [complaints] in good faith and whether the decision to discharge the employee was based on that belief." Waggoner v. City of Garland, 987 F.2d 1160, 1165-66 (5th Cir. 1993).

Further, in undertaking the pretext inquiry, we must consider Cartagena's evidence in light of the fact that the same individual — Nagle — both hired and discharged Cartagena.  Such circumstances create "an inference that discrimination was not

9

the employer's motive in terminating the employee." Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 320 n.3 (5th Cir. 1997) (citing Brown v. CSC Logic, Inc., 82 F.3d 651, 658 (5th Cir.1996)). In adopting the "same actor" inference in Brown, we highlighted the Fourth Circuit's explanation of the rationale underlying the inference: "From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" 82 F.3d at 658 (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) (quoting John J. Donohue III & Peter Siegelman, The Changing Nature of Employment Discrimination Litigation, 43 STAN. L. REV. 983, 1017 (1991))) (alterations in original).

Cartagena relied on four categories of evidence in his attempt to establish that Aegis's proffered explanation was a pretext for discrimination. First, he stated in an affidavit and in his deposition (1) that he did not threaten Marquez, but rather merely stated that they would speak to Rick Thompson, the president of Aegis, the next day, and (2) that he was not in fact having an affair with Janzack. Even assuming both of those claims to be true, as we must under a summary judgment analysis, Aegis correctly argues that Cartagena may not rely on them to establish pretext because they do not call into question that

10

Nagle and Ward decided to discharge Cartagena <u>because they believed Marquez</u>.[2]

Second, Cartagena points to Aegis's favorable evaluations of his ability to manage the loan-insuring process effectively and efficiently. Again, such evidence does not tend to undermine the credibility of Aegis's explanation for Cartagena's discharge. Nagle and Ward did not deny — and in fact they acknowledged — that Cartagena succeeded at the "loan-insuring" aspect of his job. Rather, Nagle and Ward claimed that the deficiency in Cartagena's performance was his misconduct, most significantly toward his subordinates, but also toward customers and co-workers outside his department. Evidence of Cartagena's success <u>in getting loans insured</u> cannot help Cartagena make a showing of pretext because it is irrelevant to whether Nagle and Ward in

---

[2] Also in support of his claims that he did not have an affair with Janzack and that he did not threaten Marquez, Cartagena points to the findings made by the Texas Workforce Commission in determining whether he was entitled to benefits under the Texas Labor Code. As explained above, those claims are irrelevant to the inquiry into whether Nagle and Ward believed Marquez. Moreover, as Aegis correctly points out, Texas law precludes the findings of the Texas Workforce Commission from being "used as evidence in an action or proceeding, other than an action or proceeding [before the Texas Workforce Commission], even if the action or proceeding is between the same or related parties or involves the same facts." TEX. LAB. CODE ANN. § 213.007 (Vernon 2001); <u>see also</u> <u>Waggoner</u>, 987 F.2d at 1165 (holding that article 5221b-9 of the Texas Revised Civil Statutes, the predecessor of section 213.007, rendered findings of the Texas Employment Commission inadmissible as evidence of the plaintiff's age discrimination claim).

11

good faith believed the allegations of Marquez and other employees that Cartagena had engaged in <u>misconduct</u>.

Third, Cartagena attempts to show pretext by arguing that Aegis's discrimination against him is evinced by a comparison of Aegis's treatment of him to its treatment of two white females who were also in managerial positions, but who, unlike Cartagena, were not discharged when Ward was made aware of deficiencies in their job performances. Such disparate-treatment evidence is relevant to a discrimination claim only if the employees outside the plaintiff's protected class are "similarly situated" to the plaintiff. <u>See</u> <u>Williams v. Trader Pub. Co.</u>, 218 F.3d 481, 484 (5th Cir. 2000) (citing <u>Polanco v. City of Austin</u>, 78 F.3d 968, 977 (5th Cir.1996)); <u>cf.</u> <u>Nieto v. L&H Packing Co.</u>, 108 F.3d 621, 623 n.5 (5th Cir. 1997) ("The Supreme Court has explained that th[e] inquiry [into whether a similarly-situated employee outside the plaintiff's protected class was treated more favorably] is especially relevant to a showing that the employer's proffered legitimate, non-discriminatory reason for its decision was pretext for discrimination.").

The district court properly concluded that Cartagena failed to show that the two white females —— Debbie Poppe and Micki Bong —— were similarly situated to Cartagena. Like Cartagena, Poppe was accused of misconduct toward one of her subordinates, but,

12

unlike Cartagena, she was not discharged.[3]  Specifically, Poppe allegedly stated that she "almost slapped" Donna McDowell and that she "felt like she could slap a couple of other people in [her] department."  Poppe's situation was not sufficiently similar to that of Cartagena, however, because, unlike Cartagena, Poppe did not already have a history of misconduct when the specific incident occurred.  See Nieto, 108 F.3d at 623 (in concluding that the plaintiff was not similarly situated to another employee outside the plaintiff's protected class, pointing to evidence that the plaintiff had a prior disciplinary record, but the other employee did not).  Further, in relating the incident to Ward, McDowell did not accuse Poppe of making a threat or express that she was afraid of Poppe, as Marquez did when she reported her encounter with Cartagena to Nagle.

Bong, the other white female who Cartagena claims was treated differently than he, was placed on probation for sixty days because she failed to obtain the necessary approval of a loan.  That, however, is a significantly different sort of performance deficiency than behaving inappropriately toward subordinates.  Thus, like Poppe, Bong was not sufficiently similarly situated to Cartagena.  Cf. Nieto, 108 F.3d at 622-23 (in concluding that the plaintiff was not similarly situated to

---

[3]  Cartagena claims that Poppe was not subject to any disciplinary action, but according to Aegis, she was placed on probation.

13

another employee, noting that the other employee "did not disobey a direct instruction from his supervisor," as the plaintiff had done, but rather failed to ensure that a subordinate had properly followed his instructions).

Finally, Cartagena attempts to establish pretext by arguing that discriminatory animus underlaid some of Nagle's remarks and thus that a jury could reasonably infer that such animus also underlaid Nagle and Ward's decision to discharge him. Cartagena asserts that during a few staff meetings, Nagle admonished the attendees to listen carefully to Cartagena because he did not speak English well. Aegis argues that Nagle's remarks are irrelevant because they were not made in the context of Cartagena's discharge.

Although Aegis is correct that Nagle's remarks are not sufficient evidence to present a factual issue on pretext, the reason is not, as Aegis contends, that Nagle did not make the remarks in the context of Cartagena's discharge. This court has recognized that the Supreme Court "emphatically stat[ed] [in Reeves] that requiring evidence of discriminatory animus to be 'in the direct context' of the employment decision is incorrect." Evans, 238 F.3d at 591 (citing Reeves, 530 U.S. at 152-53). Rather, "[t]he value of such remarks is dependent upon the content of the remarks and the speaker." Russell, 235 F.3d at 225. Specifically, the speaker must be in a position to influence the employment decision in question, and the content of

14

the remarks must indicate discriminatory animus.  See id. at 226, 229.

There is no question that Nagle had significant influence in the decision to discharge Cartagena.  Moreover, it is likely that remarks such as Nagle's could, under other circumstances, provide support for a charge of discrimination based on national origin. See EEOC Guidelines on Discrimination Because of National Origin, 29 C.F.R. § 1606.1 (2001) ("The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.") (emphasis added).[4] In the instant case, however, given Cartagena's failure to present other evidence tending to undermine the credibility of Aegis's nondiscriminatory explanation for his discharge, Nagle's remarks at most create a weak factual issue.  Standing alone, her

_____

[4]  See also, for example, Fragante v. City and County of Honolulu, 888 F.2d 591, 596 (9th Cir. 1989) (noting that "[i]t would . . . be an easy refuge . . . for an employer unlawfully discriminating against someone based on national origin to state falsely that [the reason for the employment decision was] the candidate's inability to measure up to the communications skills demanded by the job"); Carino v. Univ. of Okla. Bd. of Regents, 750 F.2d 815, 819 (10th Cir. 1984) (affirming the district court's finding that "the decision to demote the Plaintiff . . . was made on the basis of his national origin and related accent"); and Berke v. Ohio Dep't of Pub. Welfare, 628 F.2d 980, 981 (6th Cir. 1980) (affirming the district court's finding "that the plaintiff was denied two positions . . . because of her accent which flowed from her national origin").

15

remarks cannot defeat the inference created by the fact that Cartagena was discharged by Nagle, the same individual who hired him — i.e., the inference that the discharge was not motivated by discrimination. See Brown, 82 F.3d at 658 (concluding that "the facts in this particular case are not sufficiently egregious to overcome the ["same actor"] inference that [the defendant's] stated reason for discharging [the plaintiff] was not pretext for age discrimination").

Cartagena's prima facie case of discriminatory discharge and his other summary judgment evidence fail to raise a factual issue on the question whether Aegis's explanation for his discharge was a pretext for discrimination. The district court thus properly entered summary judgment against Cartagena on his discriminatory-discharge claim.

### 2.  Discriminatory Compensation

Cartagena argues that he presented sufficient evidence to raise a factual issue on whether Aegis discriminated against him in paying him less than Nelson, a white female. Aegis asserts that Cartagena's claim fails because Nelson's job did not involve substantially the same duties and responsibilities as Cartagena's.

Aegis misstates the law. In Plemer v. Parsons-Gilbane, 713 F.2d 1127 (5th Cir. 1983), we recognized that under the Supreme Court's decision in County of Washington v. Gunther, 452 U.S. 161 (1981), a Title VII discriminatory-compensation claim is not

16

limited to cases in which the plaintiff can "show that he or she was being paid less than an employee [outside the plaintiff's protected class] for performing equal, or substantially equal, work." 713 F.2d at 1131 (citing Gunther, 452 U.S. at 181). However, we also recognized that courts are loath to undertake the "subjective assessment of the value of the [relevant] jobs" that would be necessary in order to evaluate a "Gunther" discriminatory-compensation claim in the absence of direct evidence of discrimination. We thus inferred from the Gunther Court's reasoning that to establish a prima facie case of discriminatory compensation when the two relevant jobs are not equal or substantially equal, a plaintiff must produce direct evidence showing that the defendant would have paid the plaintiff more if he or she were not in the protected class. See id. at 1133-34.[5]

---

[5] The Gunther Court emphasized that such a subjective assessment was unnecessary in that case:

> Respondents' claim is not based on the controversial concept of "comparable worth," under which plaintiffs might claim increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same organization or community. Rather, Respondents seek to prove, by direct evidence, that their wages were depressed because of intentional sex discrimination, consisting of setting the wage scale for female guards, but not for male guards, at a level lower than [the defendant's] own survey of outside markets and the worth of the jobs warranted."

Gunther, 452 U.S. at 166 (citations omitted).

17

At the time Cartagena was hired, Nelson was manager of the closing department, and her salary was $500 less than Cartagena's. However, about nine months after Cartagena was hired, Nelson was promoted to vice president, and she received a raise. Consequently, at the time of Cartagena's discharge, Nelson was making $7600 more than he was. Six months after Cartagena's discharge, Nelson was again promoted, this time to senior vice president and operations manager, and the differential between their salaries increased to $17,600. Cartagena also points out that Nelson consistently received higher bonuses than he did.

Cartagena argues that because his and Nelson's salaries were essentially equal before Nelson was promoted, Aegis must have assigned their two jobs essentially the same value. Those relative values did not change as a result Nelson's promotions, he claims, because the additional responsibilities and duties that Nelson took on did not justify an increase in the value of her job beyond that of his job. Cartagena uses similar reasoning in arguing that the differences in their jobs before Nelson was promoted — i.e., manager of the government insurance department and manager of the closing department, respectively — could not have been the basis for Nelson's receiving higher bonuses.

Under Gunther as interpreted by this court in Plemer, Cartagena failed to establish a prima facie case of discriminatory compensation because he did not base his claim

18

either on a showing that his job and Nelson's job were substantially equal in terms of the type of work involved (i.e., a "classic" discriminatory-compensation claim) or on direct evidence of discrimination (such as Aegis's <u>own</u> evaluation of the relative value of the jobs, <u>see</u> <u>supra</u> note 5). Cartagena's conclusory assertion that the differences in their work did not translate into a difference in the value of their jobs is insufficient.[6]

The district court's prima facie case analysis is correct as applied to Cartagena's claim of discriminatory compensation, and the district court thus properly issued summary judgment against Cartagena on his discriminatory-compensation claim.[7]

---

[6] Even assuming Cartagena established a prima facie case of discriminatory compensation, he did not present sufficient evidence to raise a factual issue on whether Aegis's explanation for the discrepancy between his salary and bonuses and those of Nelson was pretextual. According to Aegis, it increased Nelson's salary because of her promotions, and she received higher bonuses because the employees in her department had not complained about her, as the employees in Cartagena's department had complained about him. Cartagena's claims about the relative value of their jobs, along with his other evidence discussed <u>supra</u>, Section C.1., is insufficient to withstand summary judgment.

[7] In his brief on appeal, Cartagena relies entirely on Nelson's situation as a basis for his discriminatory-compensation claim. In his summary judgment motion, Cartagena not only pointed to Nelson, but also to Pamela Whitford, the white female who replaced Cartagena as manager of the government insurance department. However, adding Whitford to our analysis would not change the result. It is undisputed that while Whitford was working as government insurance manager, she was paid by an employment agency, not by Aegis. Rather than presenting evidence of the amount that Aegis paid the employment agency for Whitford's services, Cartagena presented evidence of the amount that Whitford received from Aegis after it dissolved Cartagena's

19

### 3. Retaliation

To establish a prima facie case of retaliation, Cartagena must show "(1) that [he] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." Evans v. City of Houston, 246 F.3d 344, 352 (5th Cir. 2001) (quoting Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996)). Cartagena claims that in telling Janzack about the alleged affair between Cartagena and Janzack, Marquez was being "hostile and abusive," thereby creating "a hostile work environment" amounting to sexual harassment in violation of Title VII. Thus, Cartagena contends, he engaged in a protected activity when he confronted Marquez, and Aegis retaliated against him when it discharged him because of that activity. Aegis correctly argues that Cartagena failed to establish the first and third elements of a prima facie case for retaliation.

Cartagena engaged in a "protected activity" only if he "had at least a 'reasonable belief' that the practices [he] opposed were unlawful [under Title VII]." Long, 88 F.3d at 304 (citing Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130,

---

former position and hired her as its compliance officer and licensing manager. Cartagena failed to present any direct evidence that a discriminatory motive underlaid the difference between his salary as manager of the government insurance department and Whitford's salary as compliance officer/licensing manager.

1140 (5th Cir. Unit A Sept. 1981)). Cartagena admitted in his deposition that when he confronted Marquez, he did not believe that sexual harassment was occurring. Rather, he claimed that he concluded in hindsight that sexual harassment had occurred and that in confronting Marquez, he had attempted to prevent such harassment. This court has not determined whether the "protected activity" element of a retaliation claim includes a subjective component as well as an objective component — i.e., whether a plaintiff must not only show that a belief is objectively reasonable, but also that she or he held that belief in good faith. See Payne, 654 F.2d at 1140 n.11. We need not make that determination here, however, because even if Cartagena believed in good faith that he was opposing sexual harassment that was unlawful under Title VII, that belief is objectively unreasonable.

Even assuming that it would have been reasonable to believe that Marquez was "hostile and abusive" toward Janzack, it would not have been reasonable to believe that Marquez's actions were motivated by discrimination against Janzack <u>because she was female</u>, and thus it would not have been reasonable to believe that Marquez was sexually harassing Janzack. <u>See</u> 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . <u>because of such individual's</u> . . . <u>sex</u> . . . .") (emphasis added); <u>see also</u> <u>Oncale v. Sundowner Offshore Serv's, Inc.</u>, 523

21

U.S. 75, 81 (1998) (noting that to establish a Title VII claim of sexual harassment, "the plaintiff . . . must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex'") (emphasis omitted).

Cartagena also failed to establish the third element of a prima facie case of retaliation — i.e., a causal link between the alleged protected activity and his discharge. According to Cartagena, Aegis retaliated against him by discharging him primarily because of the Marquez incident. But there is no causal link unless Aegis knew that Cartagena was engaging in a protected activity. See Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999) (holding that as a matter of law, the defendant could not retaliate against the plaintiff "because [the defendant] did not know [the plaintiff] had engaged in a protected activity"). Given that Cartagena himself apparently did not hold such a belief, it is difficult to see why Nagle or Ward would. Moreover, Cartagena admitted in his deposition that he did not tell Nagle or Ward that he confronted Marquez to stop what he believed to be sexual harassment of Janzack.

Thus, the district court properly granted summary judgment against Cartagena on his Title VII retaliation claim as well as on his discriminatory-discharge and discriminatory-compensation claims.

## III. PROPRIETY OF THE DISCOVERY RULING

### A. *Standard of Review*

We review a district court's discovery rulings for abuse of discretion.  Duke v. Univ. of Tex. at El Paso, 729 F.2d 994, 995 (5th Cir. 1984).  Although "discovery matters are committed almost exclusively to the sound discretion of the trial Judge . . . the Judge's discovery rulings . . . are not entirely sacrosanct."  Id. at 997 (quoting Burns v. Thiokol Chemical Corp., 483 F.2d 300, 304-05 (5th Cir. 1973)).

### B. *A District Court's Discretion to Deny Discovery Before Granting Summary Judgment*

Upon granting Aegis's motion for summary judgment, the district court denied as moot all the pending procedural motions, including Cartagena's motion for reconsideration of the district court's previous denial of his requests for interrogatories and document production.  Cartagena argues that the district court abused its discretion by thus denying him the opportunity to engage in further discovery.

A district court abuses its discretion if it "denies a party an adequate opportunity to discover facts to oppose a motion for summary judgment."  Willamson v. United States Dep't of Agric., 815 F.2d 368, 382 (5th Cir. 1987).  Accordingly, in this case, the district court should not have granted Aegis's summary judgment motion without permitting Cartagena to conduct further discovery if Cartagena could have thereby "uncover[ed] one or

23

more substantial fact issues." Id. at 373.  Rather than specifying how his requested discovery could have aided him in showing that there was a genuine issue of material fact precluding summary judgment, Cartagena merely protests generally the district court's discovery ruling, claiming only that further discovery was necessary because the district court had "strictly controlled" discovery.  It is clear from the record both (1) that the discovery requested by Cartagena would not have been "likely to produce the facts needed . . . to withstand . . . summary judgment," id. at 382, and (2) that the discovery the parties did conduct pursuant to the district court's orders provided Cartagena with an adequate opportunity to oppose Aegis's summary judgment motion.

Thus, the district court did not abuse its discretion in denying Cartagena's discovery requests when it granted Aegis's summary judgment motion.

## IV. CONCLUSION

For the foregoing reasons, the district court's judgment in favor of Defendant-Appellee is AFFIRMED.

24